Filed 1/30/18

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

|  |  |
|---|---|
| SANTA BARBARA CHANNELKEEPER,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>CITY OF SAN BUENAVENTURA,<br><br>        Defendant and Appellant. | A146573<br><br>(San Francisco City & County Super. Ct. No. CPF-14-513875) |

The Ventura River watershed is home to Southern California steelhead trout, a species listed as endangered since 1997. Defendant City of San Buenaventura (City) has been diverting water from the Ventura River since 1870, but plaintiff Santa Barbara Channelkeeper (Channelkeeper) sued the City and alleges that the City's current diversions are "unreasonable" because of the effect they have on the fish during summer months, when water levels are low. Nobody disputes that the City holds water rights that would otherwise allow it to divert this water, but under the California Constitution there "is no property right in an unreasonable use" of water. (*Joslin v. Marin Municipal Water Dist.* (1967) 67 Cal.2d 132, 145 (*Joslin*).) Thus, adjudicating Channelkeeper's allegations requires the court to determine whether the environmental consequences of the City's water diversion act to cap the City's water rights at a level below its current usage.

The City not only asserts the reasonableness of its own water use, it has cross-complained against other entities who also draw water from the Ventura River watershed, alleging that *their* water use is unreasonable. The first amended cross-complaint (Cross-Complaint) against seven named cross-defendants and hundreds of "Doe" cross-

1

defendants (collectively Cross-Defendants) seeks to curtail these other entities' water use affecting the flow of the Ventura River. The question before this court is whether the trial court abused its discretion in striking the City's Cross-Complaint. We hold that it did, because the water that the Cross-Complaint seeks to prevent Cross-Defendants from using is effectively the same water that Channelkeeper asserts the City must leave in the river for the fish.

## FACTS AND PROCEDURAL BACKGROUND

The Ventura River watershed drains a fan-shaped area of about 220 square miles. The river has five reaches and several major tributaries. In Reach 4, about six miles upstream from the mouth of the river, the City diverts water with a subsurface dam and extracts groundwater that would otherwise flow into the river. Flow in any particular reach of the river is affected by the amount of water withdrawn from the river, the amount of water in underlying groundwater basins, and seasonal variations. During the summer dry seasons from 2001 to 2008, flows declined to less than 1 cubic foot per second (cfs) in Reach 4, and also in Reach 3 just below it. This flow level impairs the river's use as habitat, including for endangered, spawning, and young fish.

The Ventura River and its tributaries have been designated as critical habitat for the remaining population of Southern California steelhead trout, an endangered species whose numbers in the Ventura River had plummeted by the 1990s. In 2007, the National Marine Fisheries Service (NMFS) issued a Draft Biological Opinion finding that, to avoid jeopardizing the steelhead's continued existence, flows near Reach 4 of the Ventura River should not fall below 11 to 12 cfs. In 2013, the City conducted its own study, which concluded that at flows below 2 cfs steelhead habitat "declines significantly." Between 2008 and 2013, the City extracted about 3,000 acre-feet of surface flow and groundwater annually, a small fraction of the water to which it is entitled under pre-1914 water rights and considerably less than it took annually between 1980 and 2000. Yet Channelkeeper maintains that, "given the existing conditions in the Ventura River," the City's pumping and diversion activities are unreasonable because of their effects on the fish.

2

These are the allegations in the Complaint for Declaratory Relief and Verified Petition for Writ of Mandate (Complaint) that Channelkeeper filed on September 19, 2014. The Complaint's first count, the only one against the City, seeks a declaratory judgment that the City's use of Reach 4 is unreasonable from "April through October, and after water levels in the River fall below levels determined to be critical minimum levels required to protect steelhead." Counts two through five are directed against the State Water Resources Control Board (Board) for failing to limit the City's use of the Ventura River, which Channelkeeper alleges is a dereliction of the Board's mandatory duties under the California Constitution, section 275 of the Water Code, and the public trust doctrine. Against the Board, the Complaint seeks a writ of mandate directing it to analyze the City's use of the river, but against the City the Complaint seeks only declaratory relief.

The City answered the Complaint, denying that its use of waters from the Ventura River was unreasonable, then cross-complained. The Cross-Complaint brings into the case as Cross-Defendants numerous named and Doe entities who also extract water from the Ventura River, its tributaries, a lake filled with water diverted from the river, and the watershed's groundwater basins. The Cross-Complaint alleges that these water sources are all hydrologically connected, so that the Cross-Defendants' water use diminishes the surface and/or subsurface water flow of the Ventura River. The Cross-Complaint also alleges that the Cross-Defendants' water use is not reasonable or beneficial, and violates the public trust doctrine. Count four seeks a declaratory judgment to that effect, and to establish that the City's water use, by contrast, is reasonable, beneficial, and consistent with the public trust. Counts one and two seek injunctive relief, reducing Cross-Defendants' water use to levels that (1) are reasonable and beneficial, and (2) protect the public trust. Count three "seeks a physical solution among" the City and the Cross-Defendants, meaning a resolution of their "competing claims to water by cooperatively satisfying the reasonable and beneficial needs of each user," a goal to be accomplished "by augmenting the water supply and other practical measures."

3

Channelkeeper moved to strike the Cross-Complaint, a motion the trial court granted on September 18, 2015. The court found, "the reasonable use and public trust doctrines do not require the Court to examine other specific competing water rights on the river to resolve the actual relief that Plaintiff is requesting." The "only transaction at issue" is the reasonableness of the City's water use, the court found, and Channelkeeper's "claim does not implicate a property right." Finally, the court concluded that joining numerous parties as cross-defendants "does not . . . serve the purpose of judicial economy."

The City timely appealed, and on December 14, 2015, this court denied a motion to dismiss the appeal. We determined that the "September 18, 2015 order striking the First Amended Cross-Complaint is a final judgment," and that to the extent any portion of it is non-appealable, we would treat it as a writ petition.

## DISCUSSION

### I. *Legal Background*

We begin with a brief review of California water law and of applicable principles of civil procedure.

### A. **California's Dual System of Water Rights**

California's water belongs to the people of this state, but the right to use surface water may be acquired, either pursuant to the doctrine of riparian rights or by appropriation. (*United States v. State Water Resources Control Bd.* (1986) 182 Cal.App.3d 82, 100–101 (*United States*).) The riparian doctrine, a legacy of the English common law, "confers upon the owner of land the right to divert the water flowing by his land for use upon his land, without regard to the extent of such use or priority in time." (*Id.* at p. 101.) When water is scarce, "all riparians must reduce their usage proportionately." (*Ibid.*) The appropriation doctrine is a legacy of the California Gold Rush. It "confers upon one who actually diverts and uses water the right to do so" for beneficial uses. (*Ibid.*) An appropriator's rights are subordinate to riparian rights, and to those of all earlier appropriators. (*Id.* at pp. 101–102.) This is the "rule of priority" that determines allocations in times of shortage. (*El Dorado Irrigation Dist. v.*

4

*State Water Resources Control Bd.* (2006) 142 Cal.App.4th 937, 961 (*El Dorado*).) It means that an appropriator—especially one who is comparatively junior—may not be able to take any of the water to which it would otherwise be entitled.

Before 1914, one who sought to acquire water rights by appropriation had simply to divert and use that water to perfect a claim. Since 1914, a statutory scheme has required would-be appropriators to apply to the Board first for a permit. In reviewing permit applications, the Board examines existing riparian and appropriative rights and determines whether surplus water is available. (*United States*, *supra*, 182 Cal.App.3d at p. 102.) If the Board issues a permit, the permit holder can take the water subject to the terms of the permit (and subject to the rights of riparian users and senior appropriators), and a license will then issue confirming appropriative rights. (*Ibid.*)

Similar principles govern rights to water in an underground basin. First priority goes to the landowner whose property overlies the ground water. These "overlying rights" are analogous to riparian rights in that they are based on ownership of adjoining land, and they confer priority. (*City of Barstow v. Mojave Water Agency* (2000) 23 Cal.4th 1224, 1240 (*Barstow*).) Surplus groundwater also may be taken by an appropriator, and priority among "appropriative rights" holders generally follows the familiar principle that "the one first in time is the first in right." (*Id.* at p. 1241.) With groundwater there is an exception, however, that gives rise to a third category of rights. Under certain circumstances, an appropriator may gain "prescriptive rights" by using groundwater to which it is not legally entitled in a manner that is " 'actual, open and notorious, hostile and adverse to the original owner, continuous and uninterrupted for the statutory period of five years, and under claim of right.' " (*Ibid.*) The permit and licensing requirements that apply to certain in-stream water rights do not apply to groundwater. (*City of Pasadena v. City of Alhambra* (1949) 33 Cal.2d 908, 933–934.)

Whatever their derivation, "once rights to use water are acquired, they become vested property rights." (*United States*, *supra*, 182 Cal.App.3d at p. 101.) These property rights are not absolute, however.

**B. The Rule of Reasonableness and the Public Trust Doctrine**

Superimposed on the dual system for defining water rights are two limiting principles. First is the rule of reasonableness: "the overriding constitutional limitation that the water be used as reasonably required for the beneficial use to be served." (*United States*, *supra*, 182 Cal.App.3d at p. 105.) Second is the public trust doctrine. Both apply to limit all water rights, regardless of their legal basis. (*Barstow*, *supra*, 23 Cal.4th at pp. 1241–1242.)

The rule of reasonableness was added to the California Constitution by amendment in 1928. (*Light v. State Water Resources Control Bd.* (2014) 226 Cal.App.4th 1463, 1479 (*Light*).) The amended Constitution declares: "The right to water or to the use or flow of water in or from any natural stream or water course in this State is . . . limited to such water as shall be reasonably required for the beneficial use to be served, and such right does not and shall not extend to the waste or unreasonable use or unreasonable method of use or unreasonable method of diversion of water." (Cal. Const., art. X, § 2.) "Beneficial use" and "reasonable use" are two separate requirements, both of which must be met. (*Joslin*, *supra*, 67 Cal.2d at p. 143.)

Beneficial uses are categories of water use. For Reaches 3 and 4 of the Ventura River, the designated beneficial uses are: "municipal and domestic supply, industrial service supply, agricultural supply, ground water recharge, freshwater replenishment, warm freshwater habitat, cold freshwater habitat, wildlife habitat, rare, threatened, or endangered species, migration of aquatic organisms, spawning, reproduction, and/or early development, and wetland habitat," according to the Complaint. All beneficial uses are not created equal. The California Legislature has declared that "water for domestic purposes is the highest use," and that agricultural use comes second. (Water Code, § 106.)

What constitutes reasonable use is case-specific. "California courts have never defined . . . what constitutes an unreasonable use of water, perhaps because the reasonableness of any particular use depends largely on the circumstances." (*Light*, *supra*, 226 Cal. App. 4th at p. 1479.) Conformity with local custom is one factor to

6

consider in determining whether a use of water is reasonable, but custom is not dispositive.  (Water Code, § 100.5.)  The inquiry is fact-specific, and the answer may change over time.  "What may be a reasonable beneficial use, where water is present in excess of all needs, would not be a reasonable beneficial use in an area of great scarcity and great need."  (*Tulare Irrigation Dist. v. Lindsay-Strathmore Irrigation Dist.* (1935) 3 Cal.2d 489, 567 (*Tulare*).)  Because reasonableness is a question of fact, it generally is not resolvable on the pleadings.  (*People ex rel. State Water Resources Control Bd. v. Forni* (1976) 54 Cal.App.3d 743, 754 (*Forni*).)  But courts have on some occasions determined that a given use of water is, as a matter of law, unreasonable.  For example, for farmers to flood their fields during winter solely for the purpose of drowning gophers and squirrels is not a reasonable beneficial use.  (*Tulare*, at p. 568.)  So, too, is it unreasonable for a riparian landowner to rely on a creek to deliver in suspension continuing supplies of rock, sand, and gravel, when water from that stream could instead be diverted for municipal use.  (*Joslin*, *supra*, 67 Cal.2d at pp. 134–135, 140–141.)

Another important limitation on water rights in California derives from the public trust doctrine, an ancient legal principle that California courts have used to protect environmental values.  (See *Natl. Audubon Society v. Superior Court* (1983) 33 Cal.3d 419, 425 (*Natl. Audubon*).)  The doctrine finds its origin in the Roman law principle that mankind shares ownership in the sea, the seashore, the air, and (most importantly for our purposes) running water.  (*Id*. at pp. 433–434; *Zack's Inc. v. City of Sausalito* (2008) 165 Cal.App.4th 1163, 1175, fn. 5.)  The doctrine arrived in California via the English common law, and was often applied in cases involving public rights to navigation, commerce, and fishing in tideland areas, or on navigable lakes and streams.  (*Natl. Audubon*, at pp. 434–435.)  But in 1983 our Supreme Court held that the doctrine also protects navigable waters, such as Mono Lake, "from harm caused by diversion of nonnavigable tributaries."  (*Id*. at p. 437.)  The State of California as trustee has a broad "duty . . . to protect the people's common heritage of streams, lakes, marshlands and tidelands, surrendering that right of protection only in rare cases."  (*Id*. at p. 441.)  As a consequence, those "parties acquiring rights in trust property," such as water flowing in a

stream, "generally hold those rights subject to the trust, and can assert no vested right to use those rights in a manner harmful to the trust." (*Id*. at p. 437.)

But public trust interests, like other interests in water use in California, are not absolute. "As a matter of practical necessity the state may have to approve appropriations despite foreseeable harm to public trust uses. In so doing, . . . the state must bear in mind its duty as trustee . . . to preserve, so far as consistent with the public interest, the uses protected by the trust." (*Natl. Audubon*, *supra*, 33 Cal.3d at p. 446.) In short, "[a]ll uses of water, including public trust uses, must now conform to the standard of reasonable use." (*Id*. at p. 443.)

## C. Permissive Cross-Complaints

The law allows a defendant in a civil case to cross-complain against entities not originally parties to the action if there is a sufficient subject matter connection between the action and the cross-complaint. Specifically, a defendant "may file a cross-complaint setting forth" any cause of action that either "(1) arises out of the same transaction, occurrence, or series of transactions or occurrences as the cause brought against him or (2) asserts a claim, right, or interest in the property or controversy which is the subject of the cause brought against him." (Code Civ. Proc., § 428.10, subd. (b) (hereafter Code Civ. Proc., section 428.10(b)).) The term "transaction" embraces not just commercial contracts "but also whatever may be done by one person which affects another's rights and out of which a cause of action may arise." (*Kittle Mfg. Co. v. Speer* (1934) 3 Cal.App.2d 148, 149 [discussing related code section].) For example, a defendant whose negligence is alleged to have caused an accident may file a cross-complaint for equitable indemnity against concurrent tortfeasors. (*American Motorcycle Assn. v. Superior Court* (1978) 20 Cal.3d 578, 584 (*AMA*), superseded on another ground as stated in *Miller v. Stouffer* (1992) 9 Cal.App.4th 70, 82.) California cases have generally "approved a broad and liberal interpretation of [Code Civ. Proc., section 428.10's predecessor] to permit a declaration of the rights and liabilities of all parties involved in a particular case." (*Valley Circle Estates v. VTN Consolidated, Inc.*

(1983) 33 Cal.3d 604, 612, fn. 4; see also *Jasmine Networks, Inc. v. Superior Court* (2009) 180 Cal.App.4th 980, 986.)

Both parties rely on *Hanes v. Coffee* (1931) 212 Cal. 777 in interpreting Code of Civil Procedure section 428.10(b). That case was an action to quiet title brought against a defendant who claimed a lease interest to develop oil and gas on the property. (*Hanes*, at p. 778.) Defendant counterclaimed against the property owners for damages allegedly caused by plaintiffs' interference with his operations. (*Id*. at pp. 778–779.) The Supreme Court held that the trial court erred in striking that pleading, not because it was a valid counterclaim but because it was proper as a cross-complaint. (*Id*. at pp. 780–782.) Both parties' "claims are related to the same transaction, i.e., the leasing of the property, and each must be adjudicated upon a consideration of the same issues." (*Id*. at pp. 781–782.) The court reached this conclusion because "[t]he facts surrounding the cause of action and not the form of the complaint are determinative of what constitutes the transaction." (*Id*. at p. 781.)

## D. Standard of Review

The parties agree on the standard of review that governs this case. "An order striking a pleading [citation] is reviewed for abuse of discretion." (*CLD Constr., Inc. v. City of San Ramon* (2004) 120 Cal.App.4th 1141, 1145.) That discretion is limited, however, by the law being applied. (*City of Sacramento v. Drew* (1989) 207 Cal.App.3d 1287, 1297.) We must "determine whether the trial court's factual findings are supported by substantial evidence and independently review its legal conclusions." (*Valley Crest Landscape Dev., Inc. v. Mission Pools of Escondido, Inc.* (2015) 238 Cal.App.4th 468, 482.)

## II. *The Complaint and Cross-Complaint Concern a Common Transaction or Occurrence: The Diversion of So Much Water from the Ventura River as to Endanger the Fish.*

The trial court struck the Cross-Complaint because the court concluded "the only transaction at issue in Plaintiff's complaint is whether or not the [City's] water use is unreasonable," and the "cross-complaint does not arise from the same transaction." The

9

City argues that the trial court has characterized Channelkeeper's Complaint too narrowly, and that the transaction should be framed in a manner not specific to the City. Rather, the transaction is "the use of water from the Ventura River affecting the River's flow," the City argues. The trial court's narrower characterization of the transaction was informed by its view of applicable law, namely that "the reasonable use and public trust doctrines do not require the Court to examine other specific competing water rights on the river to resolve" whether Channelkeeper is entitled to a declaratory judgment that the City's water use is unreasonable. The City disagrees with this statement, arguing that in this case one must consider the diversion and pumping activities of competing water users in determining the reasonableness of the City's water use. We agree with the City.

The starting point in characterizing the "transaction" at issue in the Complaint must be the facts that give rise to the cause of action. (*Hanes v. Coffee*, *supra*, 212 Cal. at p. 781.) The Complaint's central allegation against the City is that, "given the existing conditions in the Ventura River," the City's pumping and diversion of water during summer months leave too little flow in the river "to protect steelhead" and "avoid[] impacts to public trust resources." This formulation immediately begs the question whether other water users are at least partially responsible for "the existing conditions in the Ventura River." Can other water users, by reducing the amount of water they divert from the river or pump from surrounding groundwater basins, ensure sufficient waterflow in the river to protect the steelhead (and other public trust resources) without any diminution in the volume of water the City draws? The Complaint does not allow an answer to this question because it says almost nothing about the demands on the river made by competing water users. But it does allege that "[f]low in any particular reach of the River" depends generally on surface and groundwater "withdrawals for municipal, domestic, or agricultural uses," as well as on natural factors. In the words of the Cross-Complaint, between the river and its surrounding groundwater basins there is a "hydrological connection." This means that other water users' pumping and diversion activities may be contributing to the alarmingly low waterflow alleged in Reaches 3 and 4, and if these activities were curtailed the waterflow in the Ventura River might

10

improve. Any significant improvement would take some pressure off of the City's water use, and might even leave enough water in the river to render the City's water use reasonable. The only way to know how influential other water users are—or are not—is to look at their water use, too.

Because of how Channelkeeper has framed its Complaint, the court cannot completely ignore the activities of competing water users. We reach this conclusion not because of the legal theory Channelkeeper employs—our Constitution's article X, section 2's rule of reasonableness—but because of the facts that Channelkeeper deploys (or fails to deploy) in support of its claim. The Complaint alleges that the City's water use is unreasonable because it results in insufficient flow in Reaches 3 and 4 of the river during summer months. This is Channelkeeper's sole allegation as to what is unreasonable about the City's water use. The Complaint does not allege that the City uses water unreasonably because the City consumes much more water than do similarly situated cities. The Complaint does not allege that City water users engage in inherently wasteful practices, akin to the drowning of gophers by winter irrigation (see *Tulare*, *supra*, 3 Cal.2d at p. 568), or the use of a stream as an agent for delivering suspended sand and gravel (see *Joslin*, *supra*, 67 Cal.2d at pp. 134–135, 140–141). The Complaint also does not allege that competing water users can be ignored because they take only *de minimis* amounts of water, or because they divert and pump in a manner that does not affect the flow in Reaches 3 and 4. Finally, the Complaint does not allege that the City's water rights are junior to those of all other entities who pump and divert water in the watershed so that, under the rule of priority governing water allocations, the City must be first to forgo its share if more water must be left in the river for public trust purposes. There is, in short, no basis in the facts surrounding the cause of action against the City for limiting the "transaction" at issue to the City's water use alone.

Instead, the transaction must be defined to include any diversion and pumping of water that leads to allegedly insufficient flow in Reaches 3 and 4 of the river in summer months. This "transaction" is the wrong-doing of which Channelkeeper complains, generalized to include all entities potentially responsible for it.

11

An analogy to concurrent tortfeasors shows that the law requires this generalizing step, both in defining the "transaction" and in deciding whether the Cross-Complaint is proper. Suppose an accident victim brings a suit alleging negligence against a defendant that is partially responsible for the accident, and the defendant files a counterclaim against another entity, alleging that the counter-defendant, too, is partially responsible for the accident. The transaction at issue would be "the accident," not just the original defendant's contribution to the accident. (See *Todhunter v. Smith* (1934) 219 Cal. 690, 693 ["Where separate causes of action for personal injuries and for damages to the automobiles involved arise from an automobile collision, such accident may be said to be the 'transaction' out of which said causes arise"].) And the cross-complaint would be proper. (See *AMA*, *supra*, 20 Cal.3d at pp. 584–585.) "[A] defendant is generally authorized to file a cross-complaint against a concurrent tortfeasor for partial indemnity on a comparative fault basis, even when such concurrent tortfeasor has not been named a defendant in the original complaint." (*Id*. at p. 607.) By analogy, the City is authorized to file a cross-complaint against other water users in the Ventura River watershed, where it alleges that other users are partially responsible for the reduced waterflow in Reaches 3 and 4 during summer months.

Channelkeeper protests that it "should be able to control [its] case by proceeding against the party or parties whom [it] feels to be most clearly liable." (*Thornton v. Luce* (1962) 209 Cal.App.2d 542, 551.) However, the case on which Channelkeeper relies for this proposition predates *AMA* and is no longer good law on this point. *Thornton v. Luce* held that a defendant in a negligence action may not cross-complain against a concurrent tortfeasor in order to lighten its own burden. (*Thornton*, at pp. 551–552.) *AMA* holds just the opposite, allowing such a cross-complaint to stand. (*AMA*, *supra*, 20 Cal.3d at p. 607.) *AMA* now controls.

Although its procedural posture is different, *El Dorado* also supports the City's right to cross-complain against other water users. Plaintiff water users in *El Dorado* had rights dating back to 1927 to appropriate water from the South Fork of the American River. (*El Dorado*, *supra*, 142 Cal.App.4th at p. 942.) In issuing a permit allowing

12

plaintiffs to exercise those rights, the Board imposed a term requiring them to curtail their diversion of water at certain times of year (when federal or state authorities were releasing stored water from the Central Valley Project or the State Water Project) in order to promote water quality objectives in the Sacramento-San Joaquin Delta. (*Id*. at p. 943.) Other water users in the Delta watershed whose appropriative rights derived from applications filed after 1927 were not bound by this same permit restriction, prompting plaintiff water users to object that the Board's decision constraining their water use without similarly constraining junior appropriators violated the rule of priority for allocating scarce water. (*Ibid*.) They brought an administrative mandamus proceeding challenging the restrictive term in their permit, and won relief.

In affirming the trial court's decision favoring plaintiff water users, the appellate court discusses the rule of priority, the rule of reason, and the manner in which these two principles interact. (*El Dorado*, *supra*, 142 Cal.App.4th at pp. 961–966.) As a corollary to the constitutional principle "that all water use must be reasonable" (*id.* at p. 965), the court explains that "when the rule of priority clashes with the rule against unreasonable use of water, the latter must prevail." (*Id*. at p. 966.) But the court goes on immediately to instruct that in enforcing the rule of reasonableness "[e]very effort . . . must be made to respect and enforce the rule of priority." (*Ibid*.) Thus, the Board has the power to constrain plaintiffs' water use to protect public trust interests but must avoid, if possible, subverting established principles of water right priority in the process. (*Id*. at p. 967.) To the Board's objection that it could not impose the same term on the permits of junior water users in a proceeding convened to decide the terms only of the *El Dorado* plaintiff water users' permit, the court responded: "the Board presumably had the power to add those junior appropriators as parties to the proceeding," or to convene a parallel proceeding on the junior water users' permits. (*Id*. at pp. 969–970.) Better to broaden the proceedings to add new parties than for the Board to address environmental concerns by constraining only the senior rights holder's water use, the court held.

In order to avoid the same error in this case, the City must be allowed to proceed with its Cross-Complaint. Whether or to what extent the Cross-Defendants' water rights

13

are junior to the City's is not apparent from the pleadings, but Channelkeeper has alleged that the City's right to divert water from the river was first put in use in 1870 so its rights may be senior to some of Cross-Defendants' rights. On the logic of *El Dorado*, the City is entitled to bring these water users into the case so that the trial court can determine whether (at least) junior appropriators should share in any obligation to leave more water in the river during the summer months. The participation in the case of Cross-Defendants whose rights are senior to the City's is also proper. To the extent senior water users' are using water in an amount or manner that is unreasonable, they may not take this water, even where vested water rights would otherwise allow it. (*United States*, 182 Cal.App.3d at p. 129.) And, as *El Dorado* points out, if a rights holder such as the City must forgo water to which it otherwise is entitled in order to leave sufficient waterflow in the river to promote public trust interests, that water only serves its purpose if others are prevented from withdrawing it. (*El Dorado*, *supra*, 142 Cal.App.4th at p. 970.) Including other water users as parties to the action ensures that they, too, are bound by its outcome.

Channelkeeper discounts the significance of *El Dorado* and the rule of priority on the ground that this action is for declaratory judgment only. Channelkeeper asserts that in the current case the trial court need not "determine how much water the City can reasonably divert." That issue awaits a "subsequent process" initiated by the Board if the court declares the City's current usage unreasonable, Channelkeeper argues, and only then will "the City's priority compared to other users of the River" become relevant. The problem with this argument is that even if the trial court does not need to quantify precisely "how much water the City can reasonably divert," the entire premise of the current action is that the City cannot divert as much water as it has been diverting. If Channelkeeper succeeds in its declaratory judgment action against the City, it will be because the trial court determines that the City must take less water—or must leave more water in the stream—than in recent years has been its practice. A declaration to that effect, on the Complaint as Channelkeeper has framed it, requires the trial court to give at least some consideration to other water users. The alternative—ignoring their diversions

14

while condemning the City's—would be artificial and unfair, and likely inconsistent with the rule of priority.

Channelkeeper argues that reasonableness should be assessed on what it calls "an objective, water-right-by-water-right" basis, meaning without considering the demands and priorities of other water users in a stream system. Channelkeeper cites cases where reasonableness was, in fact, decided with respect to only one water user, but the cases are distinguishable. *Tulare* and *Joslin* are Channelkeeper's lead cases, and the unreasonableness in both of those cases consisted of a specific wasteful use of water. No such wasteful practice is alleged here.

Channelkeeper also relies on *Forni* and *Light*, two cases in which courts considered the reasonableness of farmers diverting water to spray grapes for frost protection. But these, too, involved allegations of unreasonableness apart from the mere volume of water consumed, and in any event the Board's enforcement efforts in these cases were not aimed at only one water user. In *Forni* the Board sought to prevent growers from simultaneously diverting water directly from the Napa River when cold weather approached, which the court agreed was an unreasonable use of water in the context of that case. (*Forni*, *supra*, 54 Cal.App.3d at pp. 750–751.) Not only did the Board target a specific water use (spraying grapes with water taken directly from the river), but it brought the case originally against multiple "vineyardists." (*Id.* at p. 747.) Then *Light* rejected a facial challenge to a Board regulation designed to address a similar problem in a different watershed. The regulation in *Light* designated as unreasonable any diversion from the Russian River for frost protection that was not in compliance with a plan that local water users were to devise and submit to the Board for approval. (*Light*, *supra*, 226 Cal.App.4th at pp. 1472–1473.) Because the regulation anticipated that diverting growers would devise the local plans by which they would all be bound, *Light* does not support Channelkeeper in moving against only one water user in the stream system. In fact, *Light* recognized that, "[w]hen the supply of water is insufficient to satisfy all persons and entities holding water rights, it is ordinarily the function of the rule of priority to determine the degree to which any particular use must be curtailed." (*Id.* at

15

p. 1489; see also *In re Waters of Long Valley Creek Stream Sys.* (1979) 25 Cal.3d 339, 354 (*Long Valley*) ["it appears self-evident that the reasonableness of a riparian use cannot be determined without considering the effect of such use on all the needs of those in the stream system"].)

In sum, because the Complaint alleges unreasonableness based solely on the resulting flow in the river channel, the court cannot render even a declaratory judgment without considering other water users. The trial court's contrary conclusion rests on a mistake of law. While we express no view on the merits of the pending Complaint or the proposed Cross-Complaint, we hold that the City was entitled to bring in other water users, and its Cross-Complaint should have been allowed to stand. If the trial court determines, after all parties are before it, that judicial economy is best served by sequencing the action so that it addresses the reasonableness of the City's water use before addressing the reasonableness of others' water use, Code of Civil Procedure section 1048, subdivision (b) grants it that flexibility. The section provides, "when separate trials will be conducive to expedition and economy" the court "may order a separate trial of any cause of action, including a cause of action asserted in a cross-complaint." (Code Civ. Proc., § 1048, subd. (b); see also *AMA*, *supra*, 20 Cal.3d at p. 606.) The trial court retains substantial discretion to structure the proceedings, but may not prevent the City from cross-complaining against entities that the City maintains are responsible for the reduced water flow in Reaches 3 and 4 of the Ventura River.

### III. *The Cross-Complaint Asserts Vested Water Rights Which Are the Subject of the Complaint, Seeking to Prevent the Cross-Defendants from Interfering with Them.*

A separate and independent basis for reversing the trial court's decision striking the Cross-Complaint lies in the "property" prong of Code of Civil Procedure section 428.10(b)'s test. As an alternative to the "same transaction" test, the statute allows the City to cross-complain with a cause of action that "asserts a claim, right, or interest in the property or controversy which is the subject of the cause brought against" it. (Code Civ. Proc., § 428.10(b).) The trial court found that Channelkeeper's Complaint

16

"does not implicate a property right" since only "unreasonable use of the river is at issue." We disagree.

The property to which the City asserts a claim in its Cross-Complaint is the same water that the City seeks to pump and divert from the river. The Cross-Complaint asserts that the "City is exercising vested water rights" in a manner that "is reasonable and beneficial," and it seeks to limit the Cross-Defendants' water use to a level that is also "reasonable and beneficial" after consideration of the environmental issues in Channelkeeper's Complaint. The Cross-Complaint would compel the Cross-Defendants to leave more water in the river, where it will be available to the City and the fish. Because the water sources on which all users draw are alleged to be hydrologically connected, the water that the Cross-Defendants are using and which is the subject of the City's Cross-Complaint is the same water that the City is using, which is the subject of the Complaint.

Channelkeeper argues that no property rights are at issue because there is no property right in the unreasonable use of water. But this familiar principle of water law points up the contradiction in Channelkeeper's argument. It is precisely because the City has no property right to the unreasonable use of water (*Joslin*, *supra*, 67 Cal.2d at p. 145) that Channelkeeper's declaratory judgment action implicates the City's property right. Channelkeeper seeks a judicial declaration that will limit the City's right to use water. The City aims to avoid any such constraint with its Cross-Complaint, which would limit others' water use in the watershed instead. Because both pleadings address the "reasonableness" of water use, both concern the extent of property rights to the use of water—the same water, namely, that which flows in the Ventura River or can be pumped from the watershed's groundwater basins. The fact that Channelkeeper seeks only declaratory, and not injunctive, relief does not change the fact that the subject matter of the Complaint is—at bottom—the extent of the City's water rights, specifically as they affect waterflow in Reaches 3 and 4 during the summer months.

Thus, the "property" prong of Code of Civil Procedure section 428.10(b) gives the City the right to file its Cross-Complaint, and for this reason, too, the trial court erred in

17

striking it.  In determining whether the volume of water the City is diverting and pumping is reasonable, the court must be able to consider the demands on the watershed being made by other water users, at least where other water users take pursuant to rights that are junior to the City's or in amounts that are unreasonable.  (*El Dorado*, *supra*, 142 Cal.App.4th at p. 965; *Long Valley*, *supra*, 25 Cal.3d at p. 354.)

## DISPOSITION

The judgment against the City on its Cross-Complaint, in the form of the trial court's September 18, 2015 order striking the First Amended Cross-Complaint, is reversed.  The case is remanded for further proceedings, and costs on appeal are awarded to the City.

                                   _____

                                   Tucher, J.\*

We concur:


_____

Kline, P.J.


_____

Richman, J.


*Santa Barbara Channelkeeper v. City of San Buenaventura* (A146573)


      \* Judge of the Alameda County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

19

Trial Court:   San Francisco City & County Superior Court

Trial Judge:   Hon. Suzanne Bolanos

Counsel:

Best Best & Krieger, Gene Tanaka, Shawn Hagerty, Irene S. Zurko for Defendant and Appellant.

Lawyers for Clean Water, Caroline Koch, Daniel Cooper for Plaintiff and Respondent.